**AFFIRMED; and Opinion Filed July 21, 2023**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

No. 05-22-00480-CR

No. 05-22-00481-CR

**THE STATE OF TEXAS, Appellant**
**V.**
**SEDRICK JOHNSON, Appellee**

**On Appeal from the Criminal District Court No. 6**
**Dallas County, Texas**
**Trial Court Cause Nos. F19-76129-X and No. F19-00595-X**

## MEMORANDUM OPINION

Before Justices Partida-Kipness, Smith, and Breedlove
Opinion by Justice Smith

Appellee Sedrick Johnson was charged, in two separate indictments, with injury to a child by omission[1] and capital murder of a child under ten years of age.[2] *See* TEX. PENAL CODE ANN. §§ 19.03(a)(8) (capital murder of a child under ten), 22.04 (injury to a child). The victim in each charge was C.J., an eighteen-month-old boy who lived with Johnson and his girlfriend.[3] Johnson moved to suppress his

---

[1] Trial Court Cause No. F19-76129-X; Appellate Cause No. 05-22-00480-CR.

[2] Trial Court Cause No. F19-00595-X; Appellate Cause No. 05-22-00481-CR.

[3] Johnson's girlfriend was C.J.'s guardian.

statements to law enforcement, which led police to the victim's body, and all postmortem pictures and diagrams of the victim. After a hearing, the trial court granted Johnson's motion to suppress. The trial court denied the State's motion for reconsideration, and the State timely filed this appeal.[4] *See* TEX. CODE CRIM. PROC. ANN. art. 44.01(a)(5) (providing State may appeal a trial court's order granting a motion to suppress where the appeal is not taken for delay and the evidence suppressed is of substantial importance in the case).

The State presents the following three issues for our review: (1) whether Johnson was subject to custodial interrogation at the time he stated, "I need to talk to a lawyer"; (2) if so, whether such statement was a clear and unambiguous invocation of his Fifth Amendment right to counsel; and (3) if Johnson invoked his Fifth Amendment right to counsel, whether he subsequently revoked it by talking to police. For the reasons discussed below, we affirm the trial court's order granting Johnson's motion to suppress.

## Standard for Reviewing Suppression Orders

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). We give great deference to the trial court's findings of historical facts as long as the record supports such findings. *Guzman v. State*, 955 S.W.2d 85, 87 (Tex.

---

[4] By order of the trial court, the proceedings below were stayed pending the final disposition of this appeal. *See* TEX. CODE CRIM. PROC. ANN. art. 44.01(e) (providing State is entitled to a stay in the proceedings pending the disposition of an appeal of a trial court's order granting a motion to suppress).

Crim. App. 1997). And we give deference to the trial court's rulings on mixed questions of law and fact when those rulings turn on an evaluation of credibility and demeanor. *Id.* Where such rulings do not turn on an evaluation of credibility and demeanor, we review the trial court's actions de novo. *Id.*

### Fifth Amendment Right to Counsel

The Fifth Amendment provides in relevant part that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. In *Miranda v. Arizona*, the Supreme Court explained that the right against self-incrimination included the right to have counsel present when being subjected to custodial interrogation. 384 U.S. 436, 444, 465–66, 469–71 (1966). The Court described the right to counsel under such circumstance as "the adequate protective device necessary to make the process of police interrogation conform to the dictates of the privilege" and to "[e]nsure that statements made in the government-established atmosphere are not the product of compulsion." *Id.* at 466.

If a person invokes his Fifth Amendment right, "at any time prior to or during questioning," "the interrogation must cease until an attorney is present." *Id.* at 473–74. "[A]ny statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." *Id.* at 474. Thus, once a person invokes his right to counsel, he cannot be subject to further interrogation by the police, even if he waives his rights after subsequently being advised of them, until

counsel has been provided or he "initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981).

## Evidence Presented at Suppression Hearing

Detective Angeles Hernandez, with the Dallas Police Department (DPD), testified that she interviewed Johnson in conjunction with a missing person's investigation, specifically the disappearance of a child. Johnson was in the police station, along with other interested parties, when she first spoke with him. He had come to the station voluntarily. There were also interested parties at the advocacy center that other officers were interviewing. Detective Hernandez was asked to get some background information from Johnson, such as where he was when the child went missing and whether he knew anything about the child's disappearance. She conducted a recorded interview of him in one of the interview rooms at DPD headquarters that evening. She was not the first officer to question him that day, as the investigation had begun around 6 a.m. that morning with a 9-1-1 call, and another officer had already interviewed him earlier in the day.

During the interview, Detective Hernandez left the room several times to update the other detectives and to find out answers to Johnson's questions regarding his children and his girlfriend's children. At 7:18 p.m., before Detective Hernandez returned to the room, Johnson left the room, which Detective Hernandez testified that Johnson was free to do. Detective Hernandez further testified that, when Johnson came back to the room, he was in custody and was no longer free to leave.

–4–

What occurred in the hallway between the time Johnson left the room and returned in handcuffs at approximately 7:39 p.m. is critical to our case. Detective Hernandez was not present when the conversation in question occurred; however, the recording from the interview captures the audio of that conversation.

In the hallway, Johnson told an officer that he needed to talk to his kids. The officer informed him that the kids were being questioned regarding a criminal offense. Johnson asked for what criminal offense, and the officer responded for kidnapping. Johnson stated he did not kidnap anyone. The officer explained that the children were witnesses to the child going missing and, thus, police were questioning them. Johnson replied that the children had nothing to do with it. The officer emphasized that the children were there and they saw what happened. Johnson then asked, "Who says they were there?" The officer responded, "They did," and told him he needed to go back and have a seat in the interview room. Johnson stated, "Okay, I need to talk to a lawyer." The officer told him, "Okay, but you still need to sit in that room." Johnson again asked how he was going to be able to talk to his kids; he was under the impression that his kids were being brought to him. Johnson, stated, "I don't mind talking to nobody as long as I know my kids are alright." The officer reiterated that they are at the advocacy center. She told him that the people at the advocacy center "look out for children." Johnson asked to call his grandmother, but the officer did not permit him to make a phone call at that time.

Before he sat back down in the room, he again told the officer that he wanted to see his children.

Johnson was then left in the room for six hours before Detective Rico Harris entered the room and read him his *Miranda* rights. During that time, Johnson called out to officers for help in getting up from the floor and loosening his handcuffs and for some water. He also asked about his warrants, whether he was going to be transported somewhere, and what was going on with his kids and his girlfriend. Officers told him that people were still being interviewed, they may need to interview him again, and they would try to get an update for him.

Detective Harris was at the child advocacy center interviewing other interested parties when Johnson stated, at DPD Headquarters, that he needed to talk to a lawyer. Between Johnson and his girlfriend, there were a total of six other children in the home when C.J. went missing. The children were forensically interviewed, and the FBI conducted a polygraph of Johnson's girlfriend. According to Detective Harris, he became interested in talking to Johnson based on information learned in those interviews, which were not completed until approximately 9:00 p.m. He arrived to talk to Johnson at DPD headquarters after 1:00 a.m. the next morning.

Detective Harris introduced himself when he arrived and told Johnson he knew Johnson had talked to several people already but that he had some things he wanted to ask him about. Detective Harris read him his rights, and Johnson agreed to talk. After continuously denying to Detective Harris for almost an hour that he

–6–

had anything to do with C.J.'s disappearance, Johnson broke down crying and, ultimately, confessed to placing C.J. in a nearby dumpster. Johnson told Detective Harris that C.J. was vomiting and that he tried to give him CPR but C.J. was constantly throwing up so he left the apartment with him swaddled in a blanket. Johnson said he thought about going to the hospital but did not know what to tell them, so he put C.J. in a dumpster at an apartment complex and went back home. Police later recovered C.J.'s body from a landfill where the dumpster had been emptied.

Detective Harris testified that he was aware that Johnson had been questioned several times before he arrived but was not aware that Johnson had said, "I want to talk to a lawyer." He testified that, if someone said that to him, he would have stopped the interview. And he agreed that, if Johnson said that to a different detective, that detective should have stopped the interview. The trial court played the recording for Detective Harris and asked him what he would have done in that situation if he had been there. Detective Harris responded, "I wouldn't have asked him any questions then."

**Findings of Historical Fact and Conclusions of Law**

The trial court entered the following relevant findings of fact:

6. After [Detective Hernandez's] interview, Detective Hernandez left the room to go see who else was there and if she needed to further interview Sedrick Johnson. She ended up being out of the room for quite some time. At 7:18 p.m., [Johnson] also leaves the room so he could check on his children.

7. At some point during this time, in the background chatter, you can hear someone say that [Johnson] needed to be interviewed again; and also that they needed to check him for warrants.

8. When [Johnson] decides to go back in the interview room after his break, at 7:35 p.m., he is stopped by several officers standing outside the door. There was a discussion in the hallway outside the interview room; and it is 7:39 p.m. before [Johnson] is seen on video coming back into the room, now handcuffed. Detective Hernandez has no further interaction with him after that.

9. During the offscreen hallway discussion, [Johnson] asked about where his children were. He is informed that they are being interviewed at the Advocacy Center. He asks the officer in the hallway how are they able to question his kids without his permission. Someone then explains that there's a crime being investigated.

10. Almost simultaneously, an officer approaches and tells [Johnson] to put his hands behind his back, and handcuffs are placed on him. [Johnson] questions what is going on, and he is informed that he is being arrested for outstanding warrants.

11. [Johnson] immediately and unambiguously invoked his right to counsel by stating: "Then I need to talk to a lawyer," as soon as he was placed in handcuffs. A voice identified as Detective Herrera can subsequently be heard stating, "Okay, but you have to go in this room first." This is at 7:39 p.m.

12. No attorney was ever called or brought to see Sedrick Johnson. He was kept in that interview room, handcuffed for almost 6 hours, until 1:20 a.m., when Detective Rico Harris initiates further questioning of [Johnson].

13. Detective Harris was never informed by Detective Herrera, or anyone else, that [Johnson] had invoked his right to have an attorney as soon as he was handcuffed.

The trial court also concluded that Johnson's "invocation of his right to counsel was not ambiguous, and the subsequent police-initiated interrogation necessitated suppressing the statements made after he sought the assistance of counsel."

**Analysis**

### 1. *Whether Johnson was Subject to Custodial Interrogation*

The State concedes that Johnson was in custody at the time he stated, "I need to talk to a lawyer." However, the State argues that Johnson was not being questioned at the time and, thus, was not subject to custodial interrogation. We disagree.

In *Miranda*, the Court explained, "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444. In *Rhode Island v. Innis*, the Court further expounded that "interrogation" included "express questioning or its functional equivalent," meaning "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." 446 U.S. 291, 300–01 (1980) (internal footnotes and citation omitted). "The concern of the Court in *Miranda* was that the 'interrogation environment' created by the interplay of interrogation and custody would 'subjugate the individual to the will of his examiner' and thereby undermine

the privilege against compulsory self-incrimination." *Id.* at 299 (quoting *Miranda*, 384 U.S. at 457–458).

As set out in the trial court's findings of fact and as supported by the record, Johnson was being ordered back into an interrogation room at the time he stated, "I need to talk to a lawyer." By this point in the evening, he had already been interviewed twice by two different detectives. It is clear that the detectives are planning to re-interview him and do re-interview him six hours later. While we are mindful that an accused cannot invoke his Fifth Amendment right to counsel anticipatorily and outside the custodial interrogation environment, we disagree with the State's position that Johnson did so here. *See McNeil v. Wisconsin*, 501 U.S. 171, 182 n.3 (1991) (noting the Court has "in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation'"). The cases the State relies on for its proposition hold that a defendant's invocation of his Sixth Amendment right to counsel does not also constitute an invocation of a defendant's Fifth Amendment right to counsel or hold that the situation did not involve police interrogation at all. *See Montejo v. Louisiana*, 556 U.S. 778 (2009); *McNeil v. Wisconsin*, 501 U.S. 171 (1991); *Pecina v. State*, 361 S.W.3d 68 (Tex. Crim. App. 2012); *Griffith v. State*, 55 S.W.3d 598 (Tex. Crim. App. 2001). None of the cases relied on by the State involve a person who has been questioned at the police department throughout the day and is being taken back into the interview room for further questioning when he invokes his right to counsel.

The *Miranda* court envisioned that an accused might invoke his Fifth Amendment right to counsel at different times and in different ways:

> If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned.

*Miranda*, 384 U.S. at 444–45. And, even in *Pecina*, the Court of Criminal Appeals noted that "a suspect who, before the police have begun reading him his *Miranda* warnings, asks them for an attorney, is entitled to one before being questioned." 361 S.W.3d at 76 n.27.

Here, Johnson did not invoke his right to counsel to a judge in a judicial proceeding or before he arrived at the police department. Instead, Johnson was at DPD headquarters, was in between interviews, was told a crime was being investigated, was told his children were being interviewed because they were witnesses to the crime, was placed in handcuffs and under arrest, and was ordered back in the room where he had already been twice interviewed, all within approximately thirty-five minutes of the previous interview ending. Under these facts, we conclude that the questioning of Johnson was ongoing and that his classification as a voluntary interviewee changed to an accused subject to custodial interrogation when he was arrested and ordered back into the interview room. The

–11–

fact that there was a pause in the questioning at the moment Johnson stated, "I need to talk to a lawyer," does not detract from our conclusion that Johnson was being subjected to custodial interrogation. To conclude otherwise would obfuscate the protections that the Supreme Court set out in *Miranda* and *Edwards* to ensure that a person may fully enjoy his right against self-incrimination, and not be overborne by the will of police, when confined alone in handcuffs for hours in a police interrogation room awaiting further interrogation by police.

## 2. *Whether Johnson Unambiguously Invoked His Fifth Amendment Right to Counsel*

The State argues that, placed in the proper context, Johnson's statement reflected a concern regarding his parental rights, not his right against self-incrimination. Therefore, the State contends, Johnson's statement was not a clear and unambiguous invocation of his right to counsel during interrogation. Again, we disagree.

We consider the totality of the circumstances when determining whether an accused clearly and unambiguously invokes his Fifth Amendment right to counsel. *State v. Gobert*, 275 S.W.3d 888, 892–93 (Tex. Crim. App. 2009). The accused "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis v. United States*, 512 U.S. 452, 459 (1994). Here, a reasonable police officer did just that as is evidenced by an officer's response to

–12–

Johnson's statement of "I need to talk to a lawyer": "Okay, but you still need to sit in that room."

The trial court was free to discredit Detective Hernandez's testimony that she interpreted Johnson's request as one in which he was ultimately seeking representation for his children because they were being interviewed at the advocacy center. As illustrated above, Johnson was told that a crime was being investigated and that his children were being interviewed as witnesses. Although Johnson wanted to speak to his children and may have even wanted to stop police questioning of them, he emphasized that his children had nothing to do with the missing child. It matters not what Johnson wanted to discuss with an attorney, only that he wanted to speak to one. Furthermore, the trial court directly asked Detective Harris whether he would still question a suspect after the suspect stated, "I need to talk to a lawyer," and Detective Harris testified, "No. If he had said it to me, I would have stopped the interview." The trial court then had Detective Harris watch the recording, and Detective Harris maintained he would not have asked Johnson any questions.

We conclude that Johnson's statement was a clear and unequivocal request for an attorney. As a result, the police were not permitted to interview him until counsel was present. *Edwards*, 451 U.S. at 484–85.

### 3. *Whether Johnson Revoked His Prior Invocation of His Fifth Amendment Right to Counsel*

Finally, the State argues that Johnson revoked his invocation of his right to counsel or limited his right because he told police he would talk to them as long as

–13–

he knew his children were safe and police told him his children were safe at the advocacy center. However, the recorded interviews and conversations with police in the hallway outside the interrogation room show that Johnson wanted to speak to his children. He asked repeatedly to talk to them and explained that he thought they were on their way to DPD Headquarters. In short, Johnson was insisting that he personally know his children were safe. Therefore, even if we concluded that Johnson limited or revoked his invocation of his right to counsel by stating he did not have a problem talking to anyone if he knew his children were safe, we cannot conclude that police merely telling him his children were safe satisfied the condition on which he agreed to talk.

The State also argues that Johnson continued to engage police during the six hours that he waited in the interrogation room. Johnson's engagement with police consisted of asking for water, asking about his warrants, asking to have his handcuffs loosened so he could sleep, and asking about his children. He never asked to talk to police about C.J.'s disappearance and, thus, never reinitiated the conversation with police as *Edwards* requires. *See id.* at 484–85.

**Conclusion**

Based on our review of the suppression record before us, we conclude that Johnson was subjected to custodial interrogation, that he invoked his Fifth Amendment right to counsel, and that police violated his right to counsel by

interrogating him further.  We affirm he trial court's order suppressing Johnson's statements to police.

/Craig Smith/
CRAIG SMITH
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
220480F.U05



## Court of Appeals
## Fifth District of Texas at Dallas
### JUDGMENT

THE STATE OF TEXAS, Appellant

No. 05-22-00480-CR     V.

SEDRICK JOHNSON, Appellee

On Appeal from the Criminal District
Court No. 6, Dallas County, Texas
Trial Court Cause No. F-1976129-X.
Opinion delivered by Justice Smith.
Justices Partida-Kipness and
Breedlove participating.

Based on the Court's opinion of this date, the order of the trial court granting
Appellee Sedrick Johnson's motion to suppress is **AFFIRMED**.

Judgment entered this 21st day of July 2023.



## Court of Appeals
## Fifth District of Texas at Dallas

### JUDGMENT

THE STATE OF TEXAS, Appellant

No. 05-22-00481-CR          V.

SEDRICK JOHNSON, Appellee

On Appeal from the Criminal District Court No. 6, Dallas County, Texas Trial Court Cause No. F-1900595-X. Opinion delivered by Justice Smith. Justices Partida-Kipness and Breedlove participating.

Based on the Court's opinion of this date, the order of the trial court granting Appellee Sedrick Johnson's motion to suppress is **AFFIRMED**.

Judgment entered this 21st day of July 2023.